IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

*IN RE HAGUE CHILD ABDUCTION APPLICATION*

| | |
|---|---|
| ROSA ELENA GARCIA ALDABA, | ) |
| Petitioner, | ) Case No. 22-2163-DDC-RES |
| v. | ) |
| VONNEIK JURADO MARTA, | ) |
| Respondent. | ) |

### MEMORANDUM AND ORDER

Petitioner Rosa Elena Garcia Aldaba filed a Petition for Return of Children under the Hague Convention on the Civil Aspects of International Child Abduction ("Hague Convention") (Doc. 1). She asserts that Respondent Vonneik Jurado Marta wrongfully removed their four children from their habitual residence in Mexico and thus breached her custody rights under the parties' Mexican Divorce Decree. On May 12, 2022, the court held a hearing on the Petition. Petitioner appeared through counsel; Respondent appeared pro se and requested additional time to retain counsel to represent him in this matter. The court heard evidence and argument at the May 12 hearing and continued the hearing to May 22 to provide Respondent time to retain counsel. He retained an attorney, and at the May 22 hearing, Petitioner and Respondent both appeared and both were represented by counsel. The court heard additional evidence and argument at the May 22 hearing. At the conclusion of hearing, the court orally granted the Petition and advised that a written Order memorializing the court's findings would follow. The court now issues this Order to memorialize its findings and its ruling granting the Petition for Return of Children.

**I.     Facts**

Petitioner and Respondent both were born in Mexico and are Mexican citizens.  On January 22, 2009, Petitioner and Respondent married in Mexico.  During their marriage, the couple had four children.  The four children are:  (1) D.M.J., a son, who is now 12 years old, (2) L.V.J.G., a daughter, who is now 10 years old, (3) A.G.J., a son, who is now seven years old, and (4) A.N.J., a daughter, who is now five years old.  All four children were born in the United States, but returned to Mexico shortly after their births.  All four children lived in Mexico their entire lives until August 2021.

On November 21, 2019, Petitioner and Respondent divorced in Mexico.  *See* Doc. 1-4 (Ex. 4 to Pet.) (Mexican Divorce Decree).  The Mexican Divorce Decree grants Petitioner sole custody of the children with visiting rights to Respondent.  *See id.* at 19 (Ex. 4 to Pet.) (Mexican Divorce Decree showing that custody of the minor children "corresponds" with Petitioner).

After the parties' divorce, the children lived with Petitioner in Ciudad Juarez, Chihuahua, Mexico, and they spent weekends (Friday evening through Monday morning) with Respondent (or Respondent's mother when Respondent was living in the United States for some periods of time).  In August 2021, Respondent took the children from Mexico and moved them to the United States without Petitioner's knowledge or permission.  Petitioner thus filed this Petition, asking the court to order Respondent to return the children to her custody in Mexico under the Hague Convention.  Petitioner asserts:  (1) she lawfully has custody of the children under the Mexican Divorce Decree, (2) the children only have resided in Ciudad Juarez, Chihuahua, Mexico, before Respondent removed the children from Mexico and took them to the United States, and (3) Respondent's removal of the children from Mexico was wrongful.

As discussed at the hearing, the court concludes that Petitioner has met her burden of proof to show that she is entitled to an Order directing Respondent to return the children to her custody under the Hague Convention and its implementing federal statute, 22 U.S.C. §§ 9001–9011.  And, Respondent hasn't come forward with evidence to meet his burden of proving any of the statutory defenses that would preclude the court from ordering him to return the children to Petitioner.  Thus, the court grants the Petition.  The court explains how it reached that decision in more detail, below.

**II.    Legal Standard**

"The Hague Conference on Private International Law adopted the Hague Convention in 1980 '[t]o address the problem of international child abductions during domestic disputes.'" *Monasky v. Taglieri*, 140 S. Ct. 719, 723 (2020) (quoting *Lozano v. Montoya Alvarez*, 572 U.S. 1, 4 (2014)).  The United States and Mexico are signatories to the Hague Convention.  Hague Conference on Private Int'l Law, *Convention of 25 Oct. 1980 on the Civil Aspects of Int'l Child Abduction*, Status Table, https://www.hcch.net/en/instruments/conventions/status-table/?cid=24.  The "core premise" of the Hague Convention is "that the interests of children . . . in matters relating to their custody are best served when custody decisions are made in the child's country of habitual residence."  *Monasky*, 140 S. Ct. at 723 (citation and internal quotation marks omitted).

To achieve that purpose, the Hague Convention requires that "a child wrongfully removed from [the child's] country of 'habitual residence' ordinarily must be returned to that country."  *Id.* at 722–23.  A child's removal is a "wrongful removal" under the Hague Convention if: "(1) the child was habitually resident in a given state at the time of the removal or retention; (2) the removal or retention was in breach of petitioner's rights under the laws of

3

that state; and (3) petitioner was exercising those rights at the time of removal or retention." *Watts v. Watts*, 935 F.3d 1138, 1143 (10th Cir. 2019) (citation and internal quotation marks omitted). The petitioner seeking an order returning a child under the Hague Convention bears the burden to prove "by a preponderance of the evidence" that a child's removal was wrongful. *See* 22 U.S.C. § 9003(e)(1); *see also Watts*, 935 F.3d at 1143.

If a petitioner satisfies the burden of proving the child's removal was wrongful, then a respondent can invoke "certain exceptions to the return obligation" under the Hague Convention. *Monasky*, 140 S. Ct. at 723; *see also* 22 U.S.C. 9003(e)(2). One of those exceptions provides that "a child's return is not in order if the return would place [the child] at a 'grave risk' of harm or otherwise in 'an intolerable situation.'" *Monasky*, 140 S. Ct. at 723 (quoting Hague Convention on the Civil Aspects of International Child Abduction, Art. 13(b), Oct. 25, 1980, T.I.A.S. No. 11670 ("Hague Convention")). A "grave risk" of harm "means the 'potential harm to the child must be severe, and the level of risk and danger . . . very high.'" *Gil-Leyva v. Leslie*, 780 F. App'x 580, 589–90 (10th Cir. 2019) (quoting *West v. Dobrev*, 735 F.3d 921, 931 (10th Cir. 2013)). A respondent must prove the "grave risk" exception by "clear and convincing evidence[.]" 22 U.S.C. § 9003(e)(2)(A) (providing that the "clear and convincing evidence" standard applies to the exception "set forth in article 13b" of the Hague Convention).

As the Supreme Court has explained, the Hague Convention's "requirement is a provisional remedy that fixes the forum for custody proceedings." *Monasky*, 140 S. Ct. at 723 (citation and internal quotation marks omitted). Thus, "neither the Hague Convention nor [its implementing statute] provides a means by which to decide 'the merits of . . . child custody claims.'" *Gil-Leyva*, 780 F. App'x at 589 (quoting 22 U.S.C. § 9001(b)(4)). "Instead, they seek 'to prevent parents from abducting children in order to avoid the jurisdiction of courts with

4

whose rulings they do not (or believe they will not) agree.'" *Id.* (quoting *Shealy v. Shealy*, 295 F.3d 1117, 1121 (10th Cir. 2002)). Thus, after a child is returned to the country of habitual residence, "the custody adjudication will proceed in that forum." *Monasky*, 140 S. Ct. at 723–24. The Hague Convention "instructs contracting states to 'use the most expeditious procedures available' to return the child to [the child's] habitual residence." *Id.* at 724 (quoting Hague Convention, Art. 2).

### III.     Analysis

As the court announced at the May 22, 2022 hearing, Petitioner has shouldered her burden to prove by a preponderance of the evidence that Respondent wrongfully removed the children from her custody in Mexico, as required by 22 U.S.C. § 9003(e)(1)(A). Indeed, Respondent concedes that Petitioner has satisfied the requirements to show wrongful removal. Specifically, Petitioner has established that: (1) all four children were habitually resident in Mexico when Respondent removed them from Mexico and brought them to the United States in August 2021; (2) Respondent's removal of the four children breached Petitioner's rights under the parties' Mexican Divorce Decree; and (3) Petitioner was exercising those rights at the time Respondent removed the children from Mexico. *See Watts*, 935 F.3d at 1143 (listing the three requirements a petitioner must prove to establish "wrongful removal" under the Hague Convention).

After conceding that Petitioner has satisfied her burden, Respondent asserted that the court should apply one of the Convention's exceptions to returning the children. Specifically, he argued that the "grave risk" exception applies here.[1] And, he argued that the court should deny the Petition because returning the children to Petitioner's custody in Mexico would "expose

---

[1]     Respondent never has argued that any of the Convention's other exceptions apply here. And, based on the evidence presented, the court doesn't find that any other exception could apply to the Petition and the underlying facts.

5

[them] to physical or psychological harm or otherwise place [them] in an intolerable situation." Hague Convention, Art. 13(b). Specifically, Respondent argued that returning the children to Mexico presents a "grave risk" of harm to the children or an otherwise intolerable situation for three reasons. *First*, Respondent alleged that the children have sustained physical abuse and neglect while in Petitioner's custody. *Second*, Respondent asserted that Mexican authorities have ignored Respondent's complaints about the alleged abuse and neglect. *Third*, Respondent argued that Ciudad Juarez is a dangerous city with high crime rates. As the court announced at the hearing, Respondent failed to come forward with "clear and convincing evidence" proving that these three reasons—whether taken collectively or considered separately—present a "grave risk" that returning the children to Mexico will expose them to harm or an intolerable situation.

### A. Alleged Abuse and Neglect

Respondent testified about several incidents that, he alleged, amounted to abuse or neglect of the children by Petitioner.

*First*, Respondent testified, starting in March 2020, he began to have concerns about Petitioner leaving the children at home alone. Respondent testified that, in March 2020, he filed a police report in Mexico. It complained that Petitioner was leaving the children at home unsupervised. *See* Resp't's Ex. 1. He testified that the problems of leaving the kids at home alone continued even after he filed the police report because his older son (D.M.J.) told him about it.

In response to this allegation, Petitioner testified that she left her children alone on occasion to go to the grocery store. She testified that she had no one else to watch them because Respondent had told others not to help her. And, she testified that she couldn't take the children

with her because the grocery stores weren't allowing children inside because of the COVID-19 pandemic.

*Second*, Respondent testified that he filed a complaint with the prosecutor in Mexico in March 2020, after he noticed that his younger son (A.G.J.) was limping and had bruises on his leg. *See* Resp't's Ex. 2. A.G.J. told his father that his mother had hit him with a belt. Respondent testified that a doctor with the prosecutor's office performed a physical exam on A.G.J. Also, Respondent testified that the prosecutor's office didn't take any action on his complaint.

In response to this allegation, Petitioner testified that A.G.J. was fighting with one of his cousins. When she and others couldn't get the two cousins to stop fighting, Petitioner took a cloth belt and hit A.G.J. on the back with it. She testified that A.G.J. had no bruises from the belt. She also testified that Respondent's lawsuit against her in Mexico alleged that A.G.J. had a scar from the incident, but A.G.J. got the scar from a bike accident.

*Third*, Respondent testified that he made another complaint to the prosecutor's office in November 2020. *See* Resp't's Ex. 3. This complaint again accused Petitioner of leaving the children at home alone and unsupervised. The prosecutor's office took no action in response to this complaint.

*Fourth*, Respondent testified that he made a report to the prosecutor's office in May 2021, after his younger son (A.G.J.) injured one of his hands. *See* Resp't's Ex. 4. According to Respondent, A.G.J. told him that Petitioner had left the children at another home and an adult male hit A.G.J.'s hands and also kicked him. Again, a doctor at the prosecutor's office examined A.G.J. And again, the prosecutor's office took no action in response to Respondent's complaint.

7

In response to this allegation, Petitioner testified that she had taken the children to Respondent's sister's home so that she could attend a doctor's appointment. After she returned, A.G.J. showed Petitioner his hand. It was swollen, and he told Petitioner that he had slipped by the pool at his grandmother's house. Petitioner took A.G.J. to the doctor, but the doctor's office couldn't diagnose the injury. The doctor prescribed a topical ointment which caused the swelling in A.G.J.'s hand to reduce. Also, Respondent conceded during his testimony that A.G.J. had no permanent injuries from the incident with his hand, and also, he had no permanent injuries from the injury to his leg described previously.

*Fifth*, Respondent testified that in November 2020, he initiated a lawsuit against Petitioner because he didn't think Petitioner was providing the children proper care and the authorities hadn't taken any action on his complaints. Respondent testified that he never received a reply from the Judge in response to his lawsuit.

*Sixth*, Respondent offered several photographs of the children's living conditions. One photograph shows his younger daughter (A.N.J.) sleeping on a couch. *See* Resp't's Ex. 6. She is wearing long pants and no shirt. She is sleeping with several blankets. Another photograph shows dirty conditions in a bathroom. *See* Resp't's Ex. 7. Other photographs show a house with clutter—clothing on the floor or in laundry baskets, dirty dishes left on tables, empty dog food cans left on a kitchen counter, and dirty pots and pans on a stove and in the kitchen sink. *See* Resp't's Exs. 8, 10–15. One photograph shows a kitchen knife left on a table. *See* Resp't's Ex. 11. And another photograph shows the contents of the home's refrigerator. *See* Resp't's Ex. 9. Respondent testified that he took eight of the 10 photographs that he submitted into evidence on the same day. Also, he took the other two photographs several weeks later, but also on the same day.

Petitioner confirmed that these photographs accurately show her home.  She testified that she is a single mom and she works at a factory.  She testified that she did the best that she could to take care of the children when they were in her custody in Mexico.  She worked to provide food and shelter for her children.  She took them to the doctor when they were sick.  She says that she always put the children's interests before hers.

*Last*, Respondent testified that his older son (D.M.J.) threatened to kill himself in March 2021.  His son was with Petitioner when the suicide attempt occurred.  Petitioner testified that D.M.J. was holding a knife near his neck.  Petitioner called Respondent, and he got on the phone with D.M.J.  His son was upset and crying.  He told Respondent that he was going to kill himself because he was arguing with his mother about homework, being hungry, and her making him go visit another house where he didn't like to go.

Petitioner confirmed that this incident occurred.  She testified that she was scared and that she called Respondent.  Also, she testified that D.M.J. was having behavior issues around this time.  She testified that Respondent was manipulating the children when he had them for visits, and when the children returned to her, they would protest that they didn't want to come back home.  Because of these behavior changes, Petitioner sought psychological treatment for the children at a facility in Ciudad Juarez.  *See* Pet.'s Ex. M.

After considering all the testimony and other evidence, the court concluded that Respondent failed to establish by clear and convincing evidence that returning the children to Petitioner's custody in Mexico presents a "grave risk" of harm or an intolerable situation.  Petitioner and Respondent's testimony at the two hearings differed significantly.  Respondent asserted that Petitioner was an abusive and neglectful mother.  But Petitioner provided credible testimony that she is working hard to provide for her children as a single mother.  She testified

9

that she has had to leave the children at home alone, but this occurred because she needed to go to the grocery store to buy food for the family. Although the living conditions shown in the photographs of the children's home aren't ideal, most of them simply show clutter and mess that one could expect to see in a busy household of a single, working mother with four children. For A.G.J.'s injuries, Petitioner provided a benign explanation for their cause, she testified that she sought medical treatment for her son, and the Mexican authorities never acted on Respondent's complaints, suggesting that the evidence may not have substantiated the allegations of abuse and neglect. And for D.M.J.'s suicide attempt, the evidence simply doesn't connect this incident to any alleged abuse or neglect. Instead, both parties testified that Petitioner called Respondent to alert him of the concern. Petitioner testified that she was scared. Both parties tried to calm their son. And, Petitioner sought out psychological treatment for all four children, including D.M.J. *See* Pet.'s Ex. M. If anything, the psychological records controvert the allegations of neglect. Petitioner certainly wasn't neglecting her children's mental health. To the contrary, she sought support and treatment for them.

As the court discussed at the hearing, the court is highly persuaded by an unpublished Tenth Circuit opinion that involved significantly more concerning facts and yet nonetheless affirmed the district court's order granting a father's petition for return of his children. *Gil-Leyva v. Leslie*, 780 F. App'x 580 (10th Cir. 2019). In that case, the mother opposing the return of the children "testified that she endured physical abuse, occasionally in front of the children, and that she witnessed [the father] abuse alcohol, marijuana, and prescription narcotics." *Id.* at 585. She testified that the father spanked the children, "got angry and threw objects in their vicinity, and neglected their basic needs when left alone with them." *Id.* Also, she testified that the father "allowed unsafe living conditions, with non-child-resistant bottles of prescription

10

narcotics, power tools, deconstructed machine parts, solvents, and other hazardous items lying in the home, some of which the children played with." *Id.* "And, she testified about noxious fumes in the home from [the father] cooking solvents, pennies, and vehicle parts in the kitchen." *Id.*

Despite these allegations, the Circuit held that the "grave risk" exception didn't apply. *Id.* at 590–93. The Circuit affirmed the district court's finding that the father's spankings didn't show a "grave risk" of harm. *Id.* at 591. Also, the Circuit concluded that the record contained no evidence showing that the father's "erratic behavior" posed a credible threat to the children's physical or psychological safety. *Id.* And, the Circuit found that the allegations of neglect—specifically the unsafe living conditions—didn't pose a "grave risk" of harm because the children had never sustained harm previously when they lived with the father. *See id.* at 592 ("If the children suffered no harm from [the father's] alleged negligence when they were younger and more vulnerable, we struggle to see how they face a grave risk of harm now."). The Circuit concluded that the evidence had not "demonstrated by clear and convincing evidence that these dangers present so grave and credible a threat that the children cannot safely return to Canada without [the mother's] protection." *Id.* The Circuit noted that that children's living conditions were "not ideal" but the "grave risk" exception is not available to litigate questions about the children's interests which "are matters for child-custody proceedings in the proper forum[.]" *Id.* at 593.

The facts here don't come close to the severity of the abuse and neglect allegations asserted against the father in *Gil-Leyva*. Yet, our Circuit concluded that the evidence presented in *Gil-Leyva* didn't establish the "grave risk" exception. Like the *Gil-Leyva* children, the evidence here fails to show that these children previously sustained harm from living with Petitioner in Mexico. Also, the dispute about the cleanliness of the children's living conditions

11

is one that is better left to the child-custody proceedings in Mexico. In sum, the evidence submitted fails to present clear and convincing evidence that returning the children to Petitioner's custody in Mexico presents a "grave risk" of harm or an intolerable situation arising from alleged abuse or neglect.

### B. Complaints Allegedly Ignored by Mexican Authorities

As described above, Respondent testified that he made several complaints with the police and the prosecutor's office in Mexico but that the Mexican authorities never acted on his complaints. Petitioner never was charged with a crime arising out of any of Respondent's complaints. Respondent asserts that the reason for inaction was that the Mexican authorities were indifferent to his complaints. But, his testimony also confirms that the Mexican authorities investigated his complaints. These investigations included interviews and a doctor's exam of his son's alleged injuries. And, the Mexican authorities documented the complaints and other information in the reports that Respondent introduced into evidence.

The court can't conclude that Respondent's evidence constitutes clear and convincing evidence that the children are at "grave risk" of harm simply because the Mexican authorities haven't acted on Respondent's complaints against Petitioner. Based on Petitioner's testimony— that explicitly refuted all of Respondent's abuse and neglect allegations—the Mexican authorities may have chosen not to act on Respondent's complaints because they determined that they were unsubstantiated. Thus, the evidence about the Mexican's authorities response (or lack of it) to Respondent's complaints does not present clear and convincing evidence that returning the children to Mexico presents a "grave risk" of harm to them.

### C. The Dangerousness of Ciudad Juarez

Petitioner testified that Ciudad Juarez is a dangerous city with many murders. He introduced into evidence a travel advisory issued by the United States Department of State on May 2, 2022. *See* Resp't's Ex. 16. The advisory warns travelers to reconsider travel to Chihuahua state due to crime and kidnapping. *Id.* Also, Respondent testified that he previously was a victim of a robbery in Ciudad Juarez. But also, he testified—and the evidence submitted by Petitioner establishes—that Respondent previously lived in Ciudad Juarez for many years. And, the testimony revealed that Respondent's mother and other family members live in Ciudad Juarez—or, at least, they were living there at times relevant to the dispute here. The evidence of crime in Ciudad Juarez just doesn't rise to the level of clear and convincing evidence showing that returning the children to Mexico places them in "grave risk" of harm or an intolerable situation.

After considering all of the evidence described, the court can't find that Respondent has shown that these three reasons—taken collectively or individually—present clear and convincing evidence of a "grave risk" of harm or an intolerable situation if the children are returned to Petitioner's custody in Mexico. Thus, Respondent has failed to show that the "grave risk" exception to the Hague Convention applies and precludes the court from ordering the return of the children.

### IV. Conclusion

For all these reasons, Respondent has failed to discharge his burden to come forward with clear and convincing evidence showing that the "grave risk" exception to the Hague Convention applies here. In sum, none of the Convention's exceptions preclude the court from ordering return of the children to Petitioner's custody in Mexico. Petitioner has met her burden to

13

establish that Respondent wrongfully removed the children from her custody in Mexico. As a consequence, under the Hague Convention, she is entitled to an Order returning the children to her custody in Mexico. Thus, the court grants her Petition for Return of Children (Doc. 1).

**IT IS THEREFORE ORDERED BY THE COURT THAT** Petitioner's Petition for Return of Children Under the Hague Convention (Doc. 1) is granted.

**IT IS FURTHER ORDERED THAT**, consistent with the court's May 20, 2022 Order (Doc. 16), and under the provisions of the Hague Convention and the International Child Abduction Remedies Act, 22 U.S.C. §§ 9001–9011, minor children, D.M.J., L.V.J.G., A.G.J., and A.N.J, must be returned to Mexico, and that such delivery be reported to the appropriate Central Authority by Petitioner's counsel.

**IT IS FURTHER ORDERED THAT** Respondent—if he has not done so already—immediately must return to Petitioner any and all originals or copies of the children's birth certificates and any other forms of identification.

**IT IS FURTHER ORDERED THAT** Petitioner, the children's mother, has the exclusive right to the physical and legal custody of the children during the period of time required to return the above-named minor children to Mexico, which is the country of the children's habitual residence.

**IT IS FURTHER ORDERED THAT** this Order is not a determination of the merits of any custody issues within the meaning of Article 19 of the Hague Convention.

**IT IS FURTHER ORDERED THAT** Petitioner's counsel must submit their proof of costs and reasonable attorneys' fees for the court's consideration within ten (10) days of this Order.

**IT IS FURTHER ORDERED THAT** this Order is made under the authority of 22 U.S.C. § 9003(a), which confers original and concurrent jurisdiction on state and federal district courts of the United States.

**IT IS FURTHER ORDERED THAT** this Order is effective the date below written, and shall continue in force and effect until modified or cancelled by a court of competent jurisdiction in the sovereign nation of Mexico.

**IT IS SO ORDERED.**

Dated this 24th day of May, 2022, at Kansas City, Kansas.

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**
